JOURNAL ENTRY and OPINION
The defendant-appellant herein, Aaron Hresko, appeals from his conviction on one count of sexual battery in the Cuyahoga County Court of Common Pleas. The appellant, or "Nurse Aaron" as he is referred to throughout the pleadings, was employed as a registered nurse at the Cuyahoga County Jail. Subsequent to complaints from male prisoners that the appellant was sexually harassing and/or molesting them, the Cuyahoga County Sheriff's Department wired one of the complaining prisoners and recorded an encounter between one of the complainants and appellant. Thereafter, the appellant was indicted on March 31, 1998 for three counts of sexual battery, each containing a sexually violent predator specification. A jury trial was commenced on November 30, 1998 and on December 4, 1998, the jury returned a guilty verdict on one count of sexual battery. The trial judge sentenced the appellant to one year of community control sanctions and a fine of $750. The appellant was also found to be a sexually oriented offender and ordered to surrender his nursing license. The appellant timely filed the within appeal challenging the sufficiency of his conviction.
The appellant was hired as a nurse at the County Jail in October of 1997. The incidents which underlaid the appellant's conviction began within one to two months of the appellant's employment start date at the jail. Prior to his employment with the county, the appellant had worked as a nurse at several other facilities, including University Hospital, through a nursing service provider. Before he enrolled in nursing school at Cuyahoga Community College, the appellant had served an eight-year tour of duty in the United States Navy. The appellant's responsibilities while he was enlisted in the Navy included serving as a ship secretary where he ran errands for the captain and planned social events honoring visiting dignitaries, and working as a file clerk in the Navy's Cleveland recruiting office.[1]
The appellant admits that he was romantically interested in the prisoner named in count one — the count on which he was convicted — of the indictment, Jason Smith. Yet, the appellant states that he never had any physical contact with the victim, but rather, limited his involvement to "talking dirty" to Smith and to watching from outside of the cell while Smith would masturbate. The appellant testified that he did not believe that the sort of behavior that he admits to engaging in was in any way unprofessional.
As part of the investigation, the Sheriff's department obtained victim statements from both Smith and Robert Andrews,[2] who was the named victim in count three of the indictment. Both of the victims told similar stories concerning appellant's unwanted sexual advances in their sworn statements given to investigators.
Andrews stated, both in his written statement and at trial, that he first met the appellant in December of 1997 when he was in the prison infirmary to receive treatment for an injury to his head. The appellant remarked to Andrews as he was examining him that he thought Andrews looked "cute." Shortly after that remark, the appellant requested that Andrews accompany him to the bathroom so that the appellant could "get a peek" of Andrews and see what his penis looked like. A few weeks later, when the appellant was strolling through the pod where Andrews was quartered in the jail, the appellant reached for and tried to grab Andrews' penis. Andrews testified that at this point he told the appellant "damn, man, you getting out of control * * *"." In response to this rebuke, the appellant allegedly offered to help Andrews make his bail in return for submitting to the appellant's desired sexual favors.
Andrews also testified to a third incident wherein the appellant came in to Andrews' cell with a pack of Newport cigarettes and offered them to Andrews.[3] Andrews stated at trial that he gladly accepted the cigarettes, but that he never agreed to provide sexual favors for the appellant in return. Andrews further stated that he had to urinate while the appellant was still in the cell. The appellant told Andrews that he could not step out of the cell while Andrews was urinating because he did not want to be spotted by the corrections officer ("C.O.") who was on duty.[4] Andrews finished urinating at which point the appellant grabbed Andrews' penis and, while on his knees, began attempting to perform fellatio on Andrews. At this point, Andrews shoved the appellant away from him and indicated that he was not interested in having homosexual relations with the appellant. According to Andrews, the appellant then became very agitated with Andrews and threatened him in the following manner, "[y]ou really don't want to mess with me like that because, you know, like I handle the medications and things like that." At the time of the incident, Andrews was on medication for depression. In his witness statement, Andrews also asserted that the appellant threatened him that if he told anyone about the incidents "it would be my ass rotting and not his."
The second victim to testify at trial, Jason Smith, testified that he first met the appellant in November or December of 1997 when he had to go to the prison infirmary in order to have his ears irrigated. The appellant, while irrigating Smith's ears, asked Smith if he was interested in having his bond lowered. At the time Smith was facing an indictment that included one count each of attempted aggravated murder, aggravated robbery, aggravated burglary, kidnapping and felonious assault.[5]
Smith's bond had been set at one million dollars. The appellant purportedly inferred to Smith that he was in a position where he could either get Smith's bond reduced or put Smith in touch with somebody who could help him make bond. The appellant told Smith that in return he wanted Smith to allow the appellant to perform fellatio on him and to engage in anal intercourse with him. The appellant then visited Smith on his pod approximately five days later and sexually propositioned Smith repeatedly and offered to provide him with cigarettes if he would comply. Over the course of the next several months, the appellant would "constantly" stop by Smith's pod and ask to see his penis or his bare behind, or would request other sexual favors. On one occasion, the appellant and Smith were talking when the appellant dropped to his knees without warning and began to try to perform oral sex on Smith.
On another occasion, Smith was awakened at approximately 10:00 a.m.[6] by the appellant who, having noticed that the appellant had a nocturnal erection, attempted once again to grab Smith's penis and perform oral sex. Smith stated that on this occasion he awoke when the appellant, who had been let in the cell by a C.O., exclaimed "good morning, baby." After Smith was sufficiently awake to comprehend what was happening, he was able to push the appellant away from him.
Smith also testified that the appellant, who admitted having strong feelings for Smith, constantly told Smith that he loved him and that he had since the first time he set eyes upon Smith. In addition, the appellant told Smith that he was willing to leave his partner (whom the appellant referred to as his "wife") of eight years for Smith. Smith stated, both in his witness statement and at trial, that the appellant attempted to arrange a transfer to the third shift or weekends so that he could bring Smith down to the infirmary for illicit sexual relations. The appellant told Smith that he would provide "rubbers and K-Y Jelly" for the infirmary liaisons.
After having endured months of this sort of harassment, Smith finally notified his attorney of the going-ons in the jail. The attorney, in turn, notified the Sheriff's Department, which took the above-referenced witness statement from Smith on March 12, 1998. The Sheriff's Department outfitted Smith with a tape recording device so that they could determine the veracity of Smith's allegations. On March 19, 1998, while he was wired, Smith was once again visited in his cell by the appellant. According to Smith's version of the events which unfolded that afternoon, the appellant, after once again being let in the cell by a C.O., stated to Smith that he needed his "protein drink." The appellant initially requested that Smith "come over here." The appellant is heard making the above comments on tape, as well as saying "ooh that's pretty" in reference to Smith's penis. The appellant attempted to explain at trial that he was only engaging in "dirty talk" at the request of Smith, but nowhere on the tape can Smith be heard making such a request of the appellant. The appellant stated that he had engaged in other such "dirty talk" sessions with Smith on several prior occasions.
After making the above-referenced comments, the appellant can be heard on the tape saying "how long will it take" and "put it away." The first comment was in reference to the length of time it would take for Smith to ejaculate as the appellant stimulated him with his hand and mouth. The second comment was made by the appellant to Smith after he had finished imposing himself on Smith. As he was leaving the cell, the appellant can be heard on the tape saying "promise today, promise today." This was apparently a reference to the money the appellant promised Smith that he would put into Smith's account at the jail commissary. The appellant did, in fact, send Smith a money order for $50 which was dated March 19, 1998. Appellant was forced to admit that he had sent the money order after his fingerprints were found on it. The appellant fraudulently signed the money order "Mary Smith." The appellant testified at trial that the money was for cigarettes once Smith was transferred to the Lorain Correctional Institution because he felt sorry for Smith as Smith had told him that he had no family to help him out. According to the appellant, he is quite the good Samaritan and often gives money to the poor and downtrodden for wholly altruistic reasons. Yet, Smith was admittedly the first prisoner that the appellant had bestowed his generosity upon in this manner.
The appellant was unable to satisfactorily explain why the audio tape of his encounter with Smith did not reflect that Smith asked him to talk dirty or why appellant's remarks were limited to these few comments when he claimed to have been engaged in an obscene dialogue throughout the entire episode.
Smith gave the following answers in response to questions posed to him by Detective Dominic Jarem of the Cuyahoga County Sheriff's Department at the time that Smith made his second witness statement after the March 19, 1998 episode with the appellant:
 Q: At anytime while Nurse Aaron was in your cell, did the C/O check on the two of you?
A: No he did not.
 Q: Was this the first time that Nurse Aaron was let in your cell during lock down?
A: No it isn't.
Q: Was there any set time Nurse Aaron would come and visit you?
A: No. He would pop in anytime.
Q: Can you tell me how long Nurse Aaron was in your cell?
A: Approximately 10 minutes.
 Q: Did Nurse Aaron make any threatening gestures towards you that couldn't be picked up on tape?
A: He had an intimidating expression on his face.
Q: What did you take that to mean?
A: For me to keep my mouth shut.
Smith also testified that the appellant made explicit threats against Smith's well-being if he reported the appellant's behavior:
 * * * he told me I better not say nothing to nobody, because he have friends who could come see me anywhere or any time or any where inside of the jail.
 And I was led to believe that, because here it is the corrections officers, you know, they know the rules, and they unlocking my door letting this guy come into my cell, and its against the rules for somebody to come into your cell like that, and they was just letting him into the cell.
The within appeal centers on the appellant's contention that his conviction was against the weight of the evidence because he did not hold a supervisory position at the jail and because the testimony of the victim was not credible. The first and third assignments of error, being interrelated and having a common basis in law and fact, will be addressed concurrently in this opinion. The first and third assignments of error state:
 I. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION OF (SIC) SEXUAL BATTERY IN VIOLATION OF R.C. 2907.03 (A)(6).
III. THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE
In State v. Jenks (1991), 61 Ohio St.3d 259, the Ohio Supreme Court re-examined the standard of review to be applied by an appellate court when reviewing a claim of insufficient evidence.
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.
State v. Jenks, supra, paragraph two of the syllabus. A judgment will not be reversed upon insufficient or conflicting evidence if it is supported by competent credible evidence which goes to all the essential elements of the case. Cohen v. Lamko
(1984), 10 Ohio St.3d 167. Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence.State v. Nicely (1988), 39 Ohio St.3d 147. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass (1967),10 Ohio St.2d 230.
Article IV, Section 3 (B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and the duty to weigh the evidence and determine whether the findings of * * * the trier of fact were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." State ex rel. Squire v. Cityof Cleveland (1948), 150 Ohio St. 303, 345.
The standard employed when reviewing a claim based upon the weight of the evidence, is not the same standard to be used when considering a claim based upon the sufficiency of the evidence. The United States Supreme Court recognized these distinctions inTibbs v. Florida (1982), 457 U.S. 31, where the Court held that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal; i.e., invocation of the double jeopardy clause as a bar to relitigation. Id. at 43.
Upon application of the standards enunciated in Tibbs, the court in State v. Martin (1983), 20 Ohio App.3d 172, has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The Martin court stated:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230. Hence, we must accord due deference to those determinations made by the trier of fact.
The evidence relating to the count for which the appellant was convicted consisted of the taped conversations between the appellant and Smith, as well as Smith's testimony. Additionally, a number of C.O.s and other jail personnel, testified as to the policies governing the presence of medical personnel on the pods and in inmates' cells.
The appellant's testimony in his own defense was self-serving and was directly contradicted by not only Smith's testimony, but also by the audiotape of the March 19, 1998 encounter between Smith and the appellant. The appellant was entirely unable to explain why various statements that he attributed to Smith were absent from the tape. The noises and utterances on the tape are not consistent with appellant's story that he stood outside of Smith's cell and talked dirty to Smith while he watched him masturbate. The appellant was obviously inside Smith's cell during the duration of the recorded conversation.
No reasonable person who listened to the tape of the encounter that was played at trial could reach any conclusion other than that the appellant was a willing participant in some sort of clandestine affair. The appellant speaks in hushed tones throughout the tape, he expresses concern about being found about, and he asks Smith repeatedly to keep his voice down. The appellant also expressed concern that a C.O. by the name of Paxson was growing suspicious of his frequent visits to the pod. Most of the recorded conversation between the appellant and Smith centered on the appellant's promise to put money into Smith's commissary account. The appellant did, in fact, attempt to send Smith $50 shortly thereafter. None of this is at all consistent with the appellant's version of events. Given the appellant's "alibi" and the shockingly unprofessional behavior that he admitted to at trial, it was not difficult for the finder of fact to conclude that the appellant did, in fact, commit the acts underlying the indictment.
The appellant's argument that the charge of sexual battery was not appropriate because he was not in a position of authority is without merit. R.C. 2907.03 (A)(6) states in relevant part:
 (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
 (6) The other person is in custody of law *** and the offender has supervisory or disciplinary authority over the other person.
 (B) Whoever violates this section is guilty of sexual battery, a felony of the third degree.
The committee's comment to R.C. 2907.03 states that "this section forbids sexual conduct * * * in a variety of situations where the offender takes unconscionable advantage of the victim."
Smith testified that the appellant enjoyed unusually liberal access to restricted areas of the cell and that the appellant would brag of his connections. At one point, after being spurned, the appellant expressly threatened Smith by stating that he had "friends" who could "visit" Smith in his cell at any time of the day or night.
Clearly, the appellant was a medical professional who enjoyed a position of respect within the jail system. It was precisely because of his status and influence within the jail that the appellant was able to repeatedly flaunt the applicable rules and regulations and gain access to restricted areas within the jail. The appellant preyed upon his victims by taking advantage of their ignorance of the system and their inability to control their own lives. The appellant inferred to both Andrews and Smith that he was in a position to have bonds reduced when plainly this was not the case. Worst of all, the appellant made vicious and deplorable threats of retaliation (presumably physical) against the well-being of his victims if they did not submit to his depraved sexual advances.
Despite the fact that the appellant's victims were inmates, they were nonetheless also his patients and were entitled to be treated with dignity and respect. Instead they were dehumanized in some of the foulest fashions imaginable. The appellant thoroughly betrayed the trust bestowed upon him as a medical professional and a civil servant. His sworn testimony that he did not believe that it was unacceptable for a registered nurse to engage in "dirty talk" while watching a patient masturbate, or to engage in other lascivious conduct while on duty, is indicative of his unfitness to ever again be employed as a health care provider.
Certainly, a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the essential elements of sexual battery were proven beyond a reasonable doubt. Therefore, it can be said, as a matter of law, that there was sufficient evidence at trial to support the appellant's conviction.
Next, we consider the claim that the evidence was against the manifest weight of the evidence. In assessing the credibility of the witnesses, it is apparent that the appellant lied repeatedly at trial and presented a version of events that was directly contradicted by the audio tape introduced by the state. A number of character witnesses, including former colleagues, testified on the appellant's behalf. These witnesses were nearly uniform in the high regard in which they held the appellant both personally and professionally. These same witnesses were never asked their opinion of the level of "professionalism" exhibited by the appellant during his admitted erotic tete-a-tetes with inmates to whom he found himself sexually attracted, or of his denials as to the appropriateness of his deviant behavior.
It is evident that Smith is an individual with a dubious reputation for truthfulness. Yet, given the corroboration of his accounts of the appellant's unprofessional behavior by the audio tape, the jury was entitled to believe his testimony. The appellant, on the other hand, was evasive and was conveniently unable to recall select events where it was not in his interest to do so. The appellant's testimony as to the applicable facility regulations and procedures was squarely contradicted by other jail personnel, including three C.O.s and the appellant's supervisor. Therefore, it cannot be said as a matter of law that the jury "clearly lost its way and created such a manifest miscarriage of justice" as to require a reversal of the conviction.
The appellant's first and third assignments of error are overruled.
The appellant's second assignment of error states:
 II. THE OUTRAGEOUS POLICE CONDUCT OF REQUIRING A JAIL INMATE TO WIRE HIMSELF AND ENGAGE IN AN ILLEGAL ACTIVITY IS VIOLATIVE OF THE APPELLANT'S DUE PROCESS PROTECTIONS.
Initially, it should be noted that the police did not "require" that Smith wear a recording device. Smith came to the Sheriff's Department with a complaint after having endured months of abuse. Smith readily agreed to wear the recording device anticipating correctly that without solid evidence against him, the appellant would deny the whole story and accuse his victims of fabricating their stories. Furthermore, a criminal defendant does not have a reasonable expectation of privacy in his conversations with police informants. State v. Jurek (1989), 52 Ohio App.3d 30, 32; citing Hoffa v. United States (1966), 385 U.S. 293, 302-303.
The activity engaged in by the Sheriff's Department which resulted in catching the appellant "in the act" was not illegal. It seems as if the appellant is asserting that he had some sort of privacy interest within the confines of a prisoner's cell, a place that he was prohibited from being by regulation. The course of conduct taken by the investigators in attempting to verify the accusations against the appellant before proceeding with charges was totally appropriate, as were the means of investigation which they chose to utilize.
Ohio courts do not recognize a due process defense of outrageous police conduct separate and apart from a defense of entrapment. State v. Latina (1984), 13 Ohio App.3d 182,468 N.E.2d 1139; State v. Jurek at 32-33; State v. Jelito (June 14, 1990), Cuyahoga App. No. 57174, unreported. Because appellant did not resort to the entrapment defense, he cannot now assert the defense of outrageous government conduct in violation of due process. Id.
The appellant did not raise the affirmative defense of entrapment and is, therefore, prohibited from doing so on appeal. Additionally, the facts of the case clearly show that the appellant willingly engaged in a course of illegal conduct and that he initiated each of his illicit relationships. Therefore, this assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ___________________________ MICHAEL J. CORRIGAN JUDGE
 SPELLACY, P.J. and BLACKMON, J., CONCUR.
[1] For his exemplary performance of these duties, the appellant was twice named "Sailor of the Year."
[2] In his own testimony the appellant denied ever meeting Andrews.
[3] Cuyahoga County Jail is a totally smoke free facility. Employees, as well as inmates, are prohibited from possessing cigarettes within the facility.
[4] The testimony was consistent throughout trial that it was against jail personnel policy for a nurse to be on a pod unless there was a specific request by a prisoner or a doctor. The testimony was also consistent that the personnel manual prohibited a nurse from entering the cell of a prisoner without a C.O. being present. The appellant claimed to be unaware of these policies, although he did not deny that they existed and stated that it was not unusual for him to walk around the pods unescorted.
[5] Smith eventually plead to a single count of aggravated burglary and was sentenced to a prison term of three years.
[6] Smith testified that he typically awoke around noon.