OPINION
{¶ 1} Appellant Marlene Smith was convicted of murder in the Belmont County Court of Common Pleas. The victim was 29-year-old Anthony Proviano, whose body was found in December of 1997 in a wooded area near St. Clairsville. The victim had been shot once in the chest. Although the death had originally been designated as a suicide by the county coroner, it was investigated by the police as a probable homicide. Evidence was obtained from an inmate in Pennsylvania in 1999 linking Appellant to the murder. Appellant was eventually indicted for the murder in 2004, and while in prison awaiting trial, she confessed to another inmate that she had murdered Proviano. Appellant was tried by jury in February of 2006, and was convicted of murder and a corresponding firearm specification. She filed a motion for a new trial, which was overruled, and was sentenced to 15 years to life for murder, along with a 3-year prison term for the firearm specification.
 {¶ 2} In this appeal, Appellant argues that an anonymous note should not have been excluded from evidence because it could have helped establish that Proviano's death was a suicide rather than a homicide. Appellant also argues that a new trial should have been granted based on the failure of the state to prove its case, based on confusing jury instructions, and based on indications that the jury may not have believed that she fired the gun that killed Proviano. The record indicates that the anonymous note was hearsay evidence containing unverifiable speculation about the victim, and was properly excluded from evidence. The record also indicates that the trial court did not abuse its discretion in overruling a motion for new trial because there were sufficient links in the evidence for the jury to infer that Proviano did not *Page 3 
commit suicide, and that Appellant, largely through her own admissions to a number of witnesses, committed the murder. The judgment of the Belmont County Court of Common Pleas is hereby affirmed.
 BACKGROUND AND PROCEDURAL HISTORY OF THE CASE {¶ 3} On December 23, 1997, Anthony Proviano, a 29-year-old medical student at the University of Cincinnati, checked into a Days Inn Hotel just outside of St. Clairsville, Ohio. He was driving a red 1995 Z-28 Camaro. His mother and father, who lived in Baldwin Borough near Pittsburgh, were expecting him home for Christmas. When he failed to arrive on Christmas Eve or Christmas Day, they contacted police in Pennsylvania and Ohio to report him as a missing person. On December 28th, a Pittsburgh television station lent one of its news helicopters to the local police to conduct an aerial search for Proviano's car along I-70, the likely route that Proviano would have taken from Cincinnati to Pittsburgh. The car was spotted in the hotel parking lot in St. Clairsville, just off of I-70. The helicopter landed, and local law enforcement was notified. Within an hour, a sheriffs deputy found Proviano's body in a wooded area on an abandoned township road not far from the hotel. Proviano had been shot once in the chest with what was later identified as his own .25 caliber handgun. The gun was found 98 feet from the body. Proviano's keys and wallet were in his pants pockets. Among other items, the wallet still contained his credit cards and $51.00 in cash.
 {¶ 4} The Belmont County Coroner, Dr. Manuel Villaverde, arrived at the scene and expressed his opinion that the death was a suicide. He refused to do an autopsy, in part to save the county some money, and Proviano's family decided to *Page 4 
pay for a private autopsy. This was conducted in Pittsburgh by Dr. Leon Rozin, who was working for former Allegheny County Coroner Dr. Cyril Wecht. In the autopsy it was determined that the cause of death was a single gunshot wound to the chest, striking the heart, stomach, liver and other organs. The autopsy did not allow for a determination whether the death was a homicide. The autopsy also revealed some alcohol in the victim's system. There was no evidence that he had taken any illegal substances.
 {¶ 5} The items in Proviano's hotel room had been placed in hotel storage by the time his body was discovered. The police uncovered a backpack, a shaving kit, an almost full box of .25 caliber shells, the package that contained the handgun when it was purchased, a glass tumbler that was not from the hotel, and a bottle of Royal Crown whiskey that was about one-fourth full. According to hotel staff, the bed did not appear to have been slept in.
 {¶ 6} The victim's car was found in the hotel parking lot, locked and containing a number of wrapped Christmas presents. Later investigation determined that the interior of the car had been wiped clean of any fingerprints, including the victim's own prints.
 {¶ 7} Although the coroner had ruled the death a suicide, various law enforcement agencies were treating the death as a homicide. The investigation revealed little evidence that supported the theory that Proviano would have taken his own life. His friends, family, co-workers, classmates, and acquaintances generally considered him to have been a happy, good-natured person. He was doing well in *Page 5 
school and was even studying ahead for the next semester. He was very excited about going home for Christmas, particularly to meet a new niece in the family.
 {¶ 8} In October 1998, Dr. Villaverde changed the death certificate to indicate that the cause of death was not suicide, but rather, "could not be determined." Soon afterward, the sheriffs department advertised a reward for information about the death, which they considered to be a homicide.
 {¶ 9} The investigation came to a standstill until March of 1999, when an inmate in Pennsylvania named Von Richard Mraz sent a letter to the prosecutor in Greene County, Pennsylvania, indicating that Appellant and her ex-husband, Doug Main, had some involvement with the murder. Belmont County sheriff deputies interviewed Mraz, and that investigation led to another witness, Charles Dailey. Mraz, Dailey, Main and Appellant were part of a gang involved with drug dealing and theft in 1998. Further investigation revealed that Appellant and Doug Main were heroin addicts who lived with Mraz and Dailey. Appellant was alleged to have engaged in prostitution in order to obtain drugs. All four of them had been arrested in May, 1998. Appellant was serving a prison sentence when Mraz accused her of being involved in the murder of Anthony Proviano.
 {¶ 10} Deputy Olen Martin interviewed Appellant in prison. During the interview, she denied having any knowledge of, or involvement in, the murder. When Deputy Martin showed her a photograph of the victim, her eyes welled up with tears and she said, "I'll have to talk to Doug." (Tr., p. 495.) She would not answer any more questions after that. *Page 6 
 {¶ 11} After Doug Main and Appellant became suspects in 1999, the police attempted to discover if their hair or fingerprints matched any of the samples that were in evidence, but no matches could be made.
 {¶ 12} In 2001, a new coroner of Belmont County, Dr. Gene Kennedy, issued another corrected death certificate, this time indicating that the death was a homicide.
 {¶ 13} By 2003, Appellant, Main, Dailey and Mraz had been released from incarceration. In October of 2003, Dailey contacted the police in Baldwin Borough, Pennsylvania, stating that he recently accompanied Smith to an area near the Days Inn Hotel in St. Clairsville because she wanted to search for a lost headband. They did not find it, although Dailey later took police to the same area in 2004 and a headband was discovered. Scientific tests failed to link the headband to Appellant.
 {¶ 14} On October 22, 2004, Appellant and Doug Main were jointly indicted in Belmont County on charges of murder, R.C. 2903.02(A), and conspiracy to commit murder, R.C. 2923.01(A), with a firearm specification. Both defendants were arrested in Pennsylvania and transported to Belmont County. Separate attorneys were appointed to represent them. A special prosecutor was assigned to handle the case due to the fact that the newly elected prosecutor in Belmont County had formerly worked for the public defender's office.
 {¶ 15} From October 2004 until July 2005, Appellant could not post bond and remained incarcerated. She befriended an inmate named Leslie Long, who was awaiting trial for the attempted murder of her husband. Long observed that Appellant had a picture of Anthony Proviano taped to the wall of her cell. Long later told police that Appellant had confessed many details concerning the murder of Proviano. *Page 7 
Appellant told Long that she had been with Proviano, providing sex to obtain drugs, and that he was a, "trick that went bad". (Tr., p. 811.) Appellant stated that she went to the hotel room for sex, but never indicated whether they actually had sex together. When she found out that Proviano did not have the money she wanted, she became angry. Appellant stated that Proviano had been hit in the head three times with a gun, and then had been shot. She stated that someone named Doug helped her clean up the scene of the crime afterwards. It was unclear to Ms. Long if this reference was to Doug Main, or to another man named Doug St. Clair, who was also involved in helping Appellant obtain drugs. Shortly after Appellant said these things to Leslie Long, they had a falling out in the friendship, and Appellant began threatening Long. Appellant was finally released on bond in July 2005.
 {¶ 16} Police did not discover Long's information until October, 2005. Police also obtained from Long a collection of documents discarded by Appellant when she was released from incarceration. As a result of their interviews with Long, the murder and conspiracy charges against Doug Main were dismissed in November of 2005.
 {¶ 17} During this same time period in 2005, Appellant was evaluated as to her competency to stand trial, and the trial was postponed. She was subsequently found competent to stand trial. On February 7, 2006, the conspiracy charge against Appellant was dropped, and she stood charged with only one count of murder and a firearm specification.
 {¶ 18} The trial began on February 13, 2006. Evidence at trial confirmed that Proviano had suffered a blunt force trauma to the head in addition to the gunshot wound. No defensive wounds were identified on his body. Many witnesses testified *Page 8 
as to Proviano's personality, demeanor and emotional state. The witnesses generally indicated their disbelief that he could be capable of suicide.
 {¶ 19} One witness, a close friend of Proviano, indicated that he was a recreational user of marijuana. Another witness, a former co-worker and friend, indicated that Proviano had offered him cocaine on one occasion.
 {¶ 20} Charles Dailey, Von Richard Mraz, and Leslie Long all testified at trial. Many current and former law enforcement officers also testified, including Kim Reisling, a Baldwin Borough officer, who tried to help Appellant into drug rehabilitation. Reisling saved a copy of a voice message left by Appellant, and in the message Appellant can be heard saying, "I'm a murderer. I'm a murderer." (Tr., p. 782.)
 {¶ 21} Another deputy sheriff from Washington County, Pennsylvania, testified that she transported Appellant from Belmont County back to Pennsylvania in 1997 or 1998. During the trip, they passed the exit on I-70 near St. Clairsville that leads to the Days Inn Hotel. Appellant told the deputy that there was, "a dead body over that hill." (Tr., p. 765).
 {¶ 22} Both Belmont County coroners who were involved with the case testified at trial. Dr. Villaverde continued to maintain that the death was a suicide, although he did admit at trial that various aspects of the evidence were not consistent with suicide.
 {¶ 23} During jury deliberation, the jury submitted three questions to the trial judge for clarification. The questions related to whether the essential element of "purposely" in the murder statute was the same as being "involved" in the crime, and *Page 9 
whether the jury was required to convict Appellant of the firearm specification if it found her guilty of the murder charge. The judge did not issue any further oral instructions to the jury, instead directing them to the sections of the written jury instructions that pertained to the questions they asked.
 {¶ 24} On February 22, 2006, the jury found Appellant guilty. Appellant filed a motion for a new trial on March 7, 2006. The motion was overruled, and sentencing commenced. The court sentenced Appellant to fifteen years to life in prison for murder, along with a consecutive three-year sentence for the firearm specification. This timely appeal followed.
 {¶ 25} Appellant presents five assignments of error on appeal; one, an evidentiary issue regarding the exclusion of an anonymous note, and the other four dealing with whether a motion for new trial should have been granted. For clarity, the evidentiary issue regarding the anonymous note will be discussed first, followed by the questions relating to the motion for a new trial.
 ASSIGNMENT OF ERROR NO. 3 {¶ 26} "THE TRIAL COURT ERRED IN PROHIBITING THE APPELLANT FROM USING AS EVIDENCE A HAND WRITTEN NOTE FOUND PLACED AT THE MEMORIAL SERVICE FROM WHICH THE JURY COULD HAVE INFERRED THE DEATH A SUICIDE RATHER THAN A HOMICIDE."
 {¶ 27} Appellant's argument centers around a memorial book that was made available at the University of Cincinnati for friends and fellow students of the victim to sign. Proviano had attended the medical school of the University of Cincinnati immediately prior to his death. Appellant contends that an anonymous note was *Page 10 
written in the memorial book containing comments that might be relevant to the victim's death. Appellant believes that certain statements in the note, if believed, would indicate that the victim committed suicide. Prior to trial, Appellant indicated that the anonymous note would be introduced at trial. The state filed a motion in limine to exclude the anonymous notation from trial, and the motion was granted. Appellant did not attempt to proffer the memorial book's note into evidence at trial, although a copy of it was attached to the prosecutor's motion in limine and is therefore part of the record.
 {¶ 28} The anonymous notation states: "I will miss Tony," that death is, "difficult to accept," and that, "God has the last word." The note also quotes a verse from the Bible and goes on to state that Proviano was, "riddled with doubts and questions" and that he "[constantly and forever * * * waged war in his own mind." The anonymous notation also contains a general reference to suicide: "Many say only a coward would end his life." The note ends with, "May the Lord bless you and keep you."
 {¶ 29} Appellant does not present any legal basis for reversing the trial court's decision granting the state's motion in limine, other than to say that the anonymous note was not hearsay and should have been admitted as evidence. A trial court's rulings on the inclusion or exclusion of evidence are reviewed for abuse of discretion. State v.Maurer (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768. Furthermore, an evidentiary ruling in limine is normally an interlocutory, precautionary ruling, and the decision to sustain a motion in limine is not a final determination as to admissibility.State v. Grubb (1986), 28 Ohio St.3d 199, 201, 503 N.E.2d 142. A *Page 11 
proper objection and proffer of evidence must be made at trial in order to preserve any alleged errors on appeal. Id. at 203. The record in this case does not indicate that any objection or proffer of evidence was made during the trial regarding the memorial book's anonymous note.
 {¶ 30} Even if the alleged error had been properly preserved, the note was clearly excludable as hearsay, which is, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible as evidence unless it falls within one of a number of clearly defined exceptions. Evid.R. 802-804. The notation found in the memorial book is anonymous, and an anonymous statement admitted to prove the truth of any matters asserted in that statement certainly falls within the definition of hearsay. See, e.g.,State v. Latina (1984), 13 Ohio App.3d 182, 186, 468 N.E.2d 1139;State v. Tucker, 2nd Dist. No. 20956, 2005-Ohio-5227. The only purpose for the notation would be to prove the things asserted in the note; namely, that Proviano was having doubts and questions about his life and may have committed suicide. There is no indication from the notation that the author had any personal knowledge of what Proviano was feeling or thinking before he died, or whether the musings in the note were mere conjecture based on the assumption that he committed suicide.
 {¶ 31} Even if the note had not been excluded as hearsay, it could have been excluded on the basis that it contained unsubstantiated speculation to the extent that its probative value was substantially outweighed by the likelihood that it would confuse and mislead the jury. Evid.R. 403(A). The trial judge has full discretion in *Page 12 
refusing to admit confusing or misleading evidence at trial. State v.Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 129. Because there were multiple reasons for the trial court to exclude the anonymous notation from evidence, we do not find Appellant's argument to be persuasive. Appellant's third assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. 1 {¶ 32} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION OF THE APPELLANT FOR A NEW TRIAL SINCE HER CONVICTION WAS NOT SUPPORTED BY SUFFICIENT PROBATIVE EVIDENCE."
 ASSIGNMENT OF ERROR NO. 2 {¶ 33} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION OF THE APPELLANT FOR A NEW TRIAL SINCE HER CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 ASSIGNMENT OF ERROR NO. 4 {¶ 34} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION OF THE APPELLANT FOR A NEW TRIAL SINCE IT ABUSED ITS DISCRETION IN THE MANNER IN WHICH IT RESPONDED TO THE JURY SUBMITTED QUESTIONS DURING DELIBERATIONS."
 ASSIGNMENT OF ERROR NO. 5 {¶ 35} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION OF THE APPELLANT FOR A NEW TRIAL WHERE IT WAS REVEALED THAT THE JURY DELIBERATIONS WERE SO INCONSISTENT THAT THE VERDICT RESULTED FROM SYMPATHY, BIAS, PREJUDICE OR OTHER IMPROPER MOTIVES." *Page 13 
 {¶ 36} All the remaining assignments of error relate to Appellant's motion for a new trial, timely filed on March 7, 2006. See Crim.R. 33(B). The motion itself is one page long, followed by a one-page memorandum in which the only law cited is Crim.R. 33. Appellant claimed that the trial judge did not properly respond to a jury question, that a juror indicated after trial that the jury was not unanimous regarding the conviction for the gun specification, and that the evidence was insufficient to support the verdict. These are basically the same issues raised in this appeal.
 {¶ 37} According to Crim.R. 33(A), a new trial may be granted for a variety of reasons:
 {¶ 38} "A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
 {¶ 39} "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
 {¶ 40} "* * *
 {¶ 41} "(4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified;
 {¶ 42} "(5) Error of law occurring at the trial;
 {¶ 43} "* * *" *Page 14 
 {¶ 44} A decision denying a Crim.R. 33 motion for new trial is reviewed for abuse of discretion. State v. Schiebel (1990),55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. An abuse of discretion means more than simply an error of law or an error in judgment. It implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. State v. Adams (1980),62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.
 {¶ 45} "The decision to grant a motion for new trial is an extraordinary measure that should be used only when the evidence presented weighs heavily against the conviction." State v. Samatar,152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691, ¶ 35.
 {¶ 46} Appellant's arguments can be broken into three main categories.
A. Whether a new trial should have been granted due to insufficientevidence. {¶ 47} Appellant contends that a new trial should have been granted based on a lack of evidence. Crim.R. 33(A)(4) allows for a new trial when, "the verdict is not sustained by sufficient evidence or is contrary to law." Appellant appears to be arguing that a new trial should have been granted both on grounds of insufficient evidence and because the manifest weight of the evidence did not support the verdict. Sufficiency of the evidence tests whether the evidence is legally adequate to support a verdict. State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. The manifest weight of the evidence goes to whether the evidence is persuasive or believable. Id. at 386-387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the *Page 15 
factfinder's resolution of the conflicting testimony." Id. at 387,678 N.E.2d 541, citing T /Jb bs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.
 {¶ 48} It is evident from the record that there were certain weaknesses in the state's evidence. First, there was the question whether Anthony Proviano's death was actually murder or whether he died as a result of suicide. The original coroner in this case, Dr. Manuel Villaverde, still believed, eight years after he gave his original opinion as to the cause of death, that Proviano committed suicide, although his opinion did waiver somewhat at trial. The state was able to demonstrate, though, that many facets of the evidence were not consistent with suicide. The second difficulty the state was presented with was the lack of direct physical evidence connecting Appellant to Proviano or to the events of his death on December 23, 1997. Although the state conducted many scientific tests, including DNA tests, fingerprint tests, and even a rape test that was performed on the victim, none of the results linked Appellant to the victim or to the scene of the crime. Her connection to the murder comes primarily from her own words spoken to law enforcement officials, prison inmates and her partners in crime.
 {¶ 49} Despite the difficult evidentiary hurdles that the state needed to overcome, the rule in Ohio continues to be that the trier-of-fact may believe or disbelieve any or all of the evidence or testimony from any witness. State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366,227 N.E.2d 212, paragraph one of the syllabus; State v. Barr,158 Ohio App.3d 86, 2004-Ohio-3900, 814 N.E.2d 79. The fact that there was conflicting evidence in this case does not mean that the jury could not have found Appellant guilty of murder. Furthermore, circumstantial evidence *Page 16 
possesses the same probative value as direct evidence, and there is no separate standard of review for circumstantial evidence. State v.Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Evidence supporting the verdict may be found solely through circumstantial evidence.
 {¶ 50} There were 37 witnesses in this case and over one hundred exhibits, and it is the combined effect of this massive body of evidence that sustains Appellant's guilt. There is no question that Proviano died from a single gunshot wound to the chest. Although much of the evidence could support Appellant's theory of suicide, there are also some significant pieces of evidence that are completely inconsistent with suicide. There was no suicide note. The victim had no history of depression, sadness, melancholy, or thoughts of suicide. He was generally perceived as a happy person, a good student, a hard worker, who was excited about going to visit his family in Pittsburgh for Christmas in 1997. His abandoned car was found full of Christmas presents, which supports the inference that he actually was planning to visit his family rather than commit suicide. He expressed to a variety of people that he was excited about going home and especially excited about seeing a new niece. The only significant exception to this evidence about Proviano's positive emotional outlook was found in the testimony of Sabrina Kurucz, the clerk at the Days Inn Hotel who was on duty when Proviano checked in. Kurucz thought that Proviano was distracted, troubled by something, and depressed. Her entire encounter with Proviano lasted just the few minutes it took to check him into the hotel, and she did not see him again after that. Based on that brief encounter, when she heard that Proviano's body had been found, she assumed that he had killed *Page 17 
himself. (Tr., p. 364.) It is perfectly reasonable to assume that the jury disbelieved Ms. Kurucz and relied on the much more substantial evidence pointing away from suicide.
 {¶ 51} Certain physical evidence also indicated that the death was a homicide rather than a suicide. The location and condition of the gun, bullets and bullet casings are difficult to reconcile with a suicide. The gun, a .25 caliber handgun owned by the victim, was found 98 feet away from Proviano's body. One spent bullet casing and one live round were found near the gun. One live round was found in the chamber of the gun, and the bullet had markings on it to indicate that the firing pin had hit the bullet but that the weapon misfired. It is certainly reasonable to conclude that the jury refused to infer that a suicide took place based on the unlikelihood that Proviano shot himself in the heart and then tried to shoot himself again once or twice, or that he shot himself in the heart, dropped the gun, and then walked or crawled 98 feet. Although there was some evidence that Proviano did not die instantly, and may have even survived for a few minutes after the fatal gunshot wound was inflicted, the jury could certainly have believed that it was someone else who pulled the trigger twice and either tossed the gun away or moved the body.
 {¶ 52} There were other indications that Proviano's death was not a suicide. The evidence showed that Proviano had a blunt force trauma to the head while he was alive. The injury left markings that could have been attributed to being hit with his own gun, and there was testimony indicating that this occurred. Furthermore, the ground near where the victim was found was disturbed in such a way that was difficult to reconcile with the theory that he had shot himself and then crawled away *Page 18 
for help. Even Dr. Villaverde, who was firmly convinced that the death was a suicide, was forced to admit that certain aspects of the evidence did not support his suicide theory. (Tr., pp. 611f.) There was no gunshot residue found on Proviano's hands, which would be expected if he shot himself. There were articles of clothing and other possessions of the victim scattered around the crime scene, including one shoe, a toboggan cap, a flashlight, and a jacket rolled up into a ball. There was dirt over the back of Proviano's pants that he could not explain. Dr. Villaverde also had no explanation for the misfired bullet in the chamber of the gun.
 {¶ 53} There is clearly enough evidence to establish that Proviano's death was a homicide rather than a suicide. The more challenging aspect of the case for the state was connecting Appellant to the crime. This evidence began to appear in March of 1999, approximately 15 months after the crime occurred. First, an inmate in Pennsylvania, Von Richard Mraz, sent a letter to the prosecutor in Greene County, Pennsylvania, connecting Appellant and her ex-husband, Doug Main, to the crime. Mraz was Appellant's friend in 1998 and lived in what was described as a fortified compound owned by another friend named Charles Dailey. Mraz testified that he was a drug dealer, that Appellant was a heroin user, and that he supplied her with heroin. He testified that Appellant had been involved in drug dealing, retail theft and passing bad checks. Mraz stated that Charles Dailey was in charge of their illegal enterprise.
 {¶ 54} Mraz testified that he heard Appellant say to Doug Main, "What if they fingerprint the whiskey bottle, Doug?" (Tr., p. 629.) Other evidence established that there was a whiskey bottle found in the room at the Days Inn that Anthony Proviano *Page 19 
had rented just before he was murdered. The bottle was tested for fingerprints, but Appellant's fingerprints were not discovered.
 {¶ 55} Charles Dailey testified that sometime between December 25 — 28, 1997, Appellant took him to the Days Inn Hotel in St. Clairsville, entered Anthony Proviano's red Camaro, wiped down the car to remove fingerprints, and removed something from the car. Other evidence corroborated that the car had been wiped clean of all fingerprints, including the victim's own fingerprints. Dailey also testified that Appellant asked him to take her to the same Days Inn Hotel in 2003 to search for a headband that she had lost. A headband was later found by the police in the vicinity where Dailey said Appellant was searching.
 {¶ 56} Inmate Leslie Long testified about numerous confessions Appellant made concerning the murder. Appellant told Long that she had hit Proviano on the head with his gun. She told Long that she was with Proviano for sex and drugs, and that when he did not pay, she became angry. According to Long, Appellant stated that she was not afraid to pull the trigger of the gun, that it was not the first time she had done it and it would not be the last. Appellant told Long how she shot Proviano, and that someone named Doug helped her clean up afterward. Appellant told her how they dragged the body after the shooting. Appellant also stated that she was worried about a Baldwin Borough police officer named Kim Martin, who Appellant thought was a potential witness in the case. Although there was no Kim Martin on the Baldwin Borough police force, officer Kim Reisling testified about a voicemail message left on her phone in which Appellant can be heard saying, "I'm a murderer." *Page 20 
 {¶ 57} Finally, deputy sheriff Jacqueline Salyer testified that she transported Appellant from Belmont County to Washington County, Pennsylvania in 1997 or 1998, and as they drove past the Days Inn Hotel near St. Clairsville, Appellant mentioned that there was a dead body in the field near the hotel.
 {¶ 58} The police were never able to come up with any clear explanation as to how Anthony Proviano knew or met Appellant. Nevertheless, if the testimony of Mraz, Dailey, Long, Reisling and Salyer is believed, Appellant did have some type of encounter with Proviano on December 23, 1997, and she ended up killing him with his own gun. The evidence does not clearly point to any other person who might have committed the murder, other than to raise the possibility that Doug Main, or some other person named Doug, may also have been involved. Doug Main testified at trial and denied having any contact with Proviano or the murder, and obviously, if the jury believed him, the only other suspect available was Appellant.
 {¶ 59} Appellant, of course, paints a very different portrait of the evidence. Appellant interprets the evidence to show that the death was a suicide: a depressed young man rents a hotel room, brings his gun and a bottle of whiskey with him, and then shoots himself in an isolated field near the hotel so that no one can see or hear him. Appellant discounts all the testimony of Mraz, Dailey and Long because they are criminals and because they all supposedly had motivation to fabricate Appellant's involvement in the crime. Appellant points to the lack of any physical evidence linking her to the crime. Appellant's counsel eloquently stated at trial that the state was essentially trying to prove that a heroin addict who engaged in prostitution to support her habit murdered Anthony Proviano in a fit of anger, and in so doing, *Page 21 
somehow committed the forensically perfect crime. While Appellant's counsel more than adequately highlighted the weaknesses in the state's case, the jury apparently believed those portions of the state's evidence that established Appellant as a murderer.
B. Whether a new trial was justified based on improper responses tojury questions. {¶ 60} While the jury was deliberating, they submitted three notes seeking clarification to the trial judge. The first note asked if, "purposely causing the death," of Anthony Proviano meant that Appellant, "is involved or that she is the one that pulled the trigger? Are you asking did she shoot him?" (Tr., p. 1140.) The court responded by telling the jurors to refer to the sections of the jury instructions with the headings "special instructions," "murder," and "purposely." Appellant's counsel objected and asked the court to give a further instruction clarifying that the jury had to find that Appellant actually committed the act of murder.
 {¶ 61} The jury sent a second question to the judge asking: "Does the jury all have to be in agreement with the firearm specification?" (Tr., p. 1144.) Appellant's counsel asked the judge to simply refer the jury to the last paragraph of the final instructions given by the court. The judge complied, and the jury question was returned to the jury with the instruction: "Please refer to the last paragraph of the instructions with the heading, quote, `Final instruction.'" (Tr., p. 1145.)
 {¶ 62} The third question submitted by the jury was: "If we can't agree on the second part, will it negate the first verdict on Page 1? And what happens if we cannot agree?" (Tr., p. 1146.) The first part of the jury form addressed the murder verdict; the second part was the verdict on the gun specification. The attorneys and *Page 22 
the judge considered the manner in which they could make it clear to the jury that the jurors should not proceed to page 2, the gun specification, unless they first entered a guilty verdict on page 1, the murder charge. Appellant's counsel asked the judge to tell the jury that if they did not find Appellant guilty of the gun specification, they could not find her guilty of murder. The prosecutor argued that the jury could, for whatever reason (including jury nullification) decide not to impose a gun specification even if they found Appellant guilty of murder. The court decided to answer the question by telling the jury to refer to the bottom of page 1 of the verdict form, and instructed them that their decision must be unanimous.
 {¶ 63} A trial judge, "is not prohibited from answering a jury's questions of law during deliberation." State v. Kersey (1997),124 Ohio App.3d 513, 520, 706 N.E.2d 818. A trial judge has discretion in responding to requests for clarification from the jury, and the decision of the trial court is reviewed only for abuse of discretion. State v.Carter (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph one of the syllabus. A judge may respond to a jury request for clarification by simply referring the jury to the written jury instructions, rather than giving additional oral instructions. State v. Lindsey (2000),87 Ohio St.3d 479, 488, 721 N.E.2d 995.
 {¶ 64} Appellant contends that the jury's questions prove that the jury did not believe that she shot Anthony Proviano, and that the trial judge should have specifically instructed the jury that it had to unanimously find beyond a reasonable doubt that she was the person who shot Proviano. Strangely, though, Appellant does not argue that there was any particular error with the written and oral instructions given to the jury prior to deliberations. Without some indication that the original *Page 23 
instructions were somehow deficient, it is impossible to say that the court's decision to refer the jury back to those instructions was an abuse of discretion. Appellant's argument is unpersuasive and establishes no reversible error.
C. Whether a new trial was required because the jury consideredacquittal of the firearm specification. {¶ 65} Appellant alleges that there is evidence that the jury considered acquitting her of the firearm specification, even though it had already decided to find her guilty of murder involving a fatal shooting. Appellant contends that this is completely contradictory, because there is no question that Proviano died from a gunshot wound. Appellant believes that the jury was confused by the evidence as well as the jury instructions and that the verdict was the result of compromise or misunderstanding.
 {¶ 66} When the jury requested a clarification from the trial court regarding whether it could enter a guilty verdict on the murder but also enter an acquittal on the gun specification, the prosecutor argued that such a seemingly inconsistent result (Proviano unquestionably died from a gunshot wound) may simply have been the result of jury leniency. The Ohio Supreme Court has long held that there is no inconsistency or reversible error when a jury convicts a defendant on one count but acquits on a separate but related count, "in which there is no material difference." Browning v. State (1929), 120 Ohio St. 62, 71,165 N.E. 566. That Court has also held that a failure of the jury to convict on a specification consistent with, but not a required element of, the underlying crime is not a basis for overturning the verdict: "Where a jury convicts a defendant of an aggravated murder committed in the course *Page 24 
of an aggravated robbery, and where that defendant is concurrently acquitted of a specification indicting him for identical behavior, the general verdict is not invalid." State v. Perryman (1976),49 Ohio St.2d 14, 358 N.E.2d 1040, paragraph three of the syllabus. We have previously held that a conviction on the underlying charge of murder based on a fatal shooting is not invalidated if there is no conviction on the attendant firearm specification. State v. Perdue, 153 Ohio App.3d 213,2003-Ohio-3481, 792 N.E.2d 747, ¶ 40. We reasoned that, "when jury verdicts appear inconsistent there is no more reason to attribute such inconsistencies to confusion than to basic leniency." Id. A reviewing court is not permitted to speculate whether jury leniency or some other reason may have resulted in seemingly inconsistent verdicts for separate counts and specifications in the indictment. State v. Trewartha,165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 38.
 {¶ 67} It is obvious in this case that Appellant's argument is purely speculative, because there was no inconsistent verdict. The jury convicted Appellant on both the murder charge and the gun specification. Appellant's argument is based on her conclusion that the jury at some point was planning to find her guilty of the murder charge but not guilty of the gun specification. If there is no reversible error when the jury actually convicts a defendant of murder involving a fatal shooting, but acquits him or her of a gun specification, as noted above, it is difficult to find any possible reversible error if the jury merely thinks about the possibility of acquitting on the gun specification but ultimately does enter a guilty verdict on both the underlying crime and the specification. We find no merit in Appellant's argument. *Page 25 
 {¶ 68} Appellant nevertheless is convinced that a new trial should have been granted simply because one or more jurors may have considered acquitting her on the gun specification. Obviously, this would have involved one or more jurors testifying as to their state of mind during deliberations, and this type of evidence is flatly prohibited by Evid.R. 606(B): "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith."
 {¶ 69} In this case, there is no actual evidence from any juror regarding the deliberations. The record does contain a statement made by Appellant's counsel that a juror told him that the jury had agreed to convict her of murder, but that only eight jurors wanted to convict on the gun specification. (3/30/06 Tr., p. 4.) The trial court noted that Appellant failed to submit affidavits to establish any misconduct by jurors, as required by Crim.R. 33(C). The trial court accurately stated that Evid.R. 606(B) prohibited any inquiry into the mental processes of the jurors regarding their deliberation. The court also stated that a jury verdict may not be impeached by a member of the jury alleging misconduct of another juror without first introducing "evidence aliunde," which is to say, evidence from an outside source. State v.Hessler (2000), 90 Ohio St.3d 108, 123, 734 N.E.2d 1237. The trial court then went on to discuss the fact that there was no inconsistent verdict in this case, noting that even if the jury had acquitted Appellant of the gun specification, the seeming inconsistency would not undermine the conviction for murder based on the cases *Page 26 
cited earlier, namely, Perryman and Browning, supra. The trial court appears to have fully considered Appellant's argument regarding the possibility that the jury wanted to acquit her of the gun specification, and there is no error in the trial court's analysis or conclusions. There was no reason to grant a new trial even if Appellant could prove (which she did not) that the jury actually considered acquitting her of the gun specification. Thus, the trial court was correct in overruling the motion for a new trial.
 {¶ 70} In conclusion, the trial court did not err in excluding from evidence an anonymous note that was obviously hearsay and that would have created more confusion than clarity regarding the issue of suicide. Furthermore, the trial court did not abuse its discretion in overruling a motion for new trial. There was substantial evidence supporting the verdict, including the testimony of a number of witnesses who heard Appellant confess to the murder and to details about the murder. A new trial was not warranted based on the jury deliberations, since it is not clear from the record how the trial court should have responded any differently to requests from the jury for clarifications, and because the jury was free to consider whether to convict Appellant for murder and possibly acquit her of a corresponding firearm specification. The judgment of the trial court is affirmed in full.
Donofrio, J., concurs. Vukovich, J., concurs. *Page 1