THE STATE OF OHIO, APPELLEE, *v.*
LATINA, APPELLANT.

(No. 46942—Decided January 30, 1984.)

*Mr. John T. Corrigan,* prosecuting attorney, for appellee.

*Mr. Robert J. Rotatori* and *Ms. Susan L. Gragel,* for appellant.

JACKSON, J. Appellant was indicted for and convicted of a five count indictment for violation of the drug law. He appeals, assigning seven errors for review.

Detective Thomas Neelon of the Cleveland Police Department, responding to anonymous citizen complaints, conducted an undercover investigation directed against the appellant. Neelon adopted the pseudonym Thomas Goodman and effected the lifestyle of a high-rolling underworld figure to determine whether appellant was trafficking in cocaine.

Appellant was an employee of Rush Limousine. In a recorded conversation Jon Cornell, owner of the Rush Limousine, stated that appellant was his "head chauffeur"; appellant described himself as the "main driver." Detective Neelon arranged with Cornell for appellant to pick him up at Public Square on December 3, 1982, at 1:00 p.m.

Between December 3 and December 7, 1982, Detective Neelon recorded eight conversations with appellant, by means of a wiretap upon a telephone at police headquarters, and a "body bug" hidden on Detective Neelon's person. Detective Neelon gave the unmistakable impression that he was a pimp. In their first meeting, Detective Neelon was accompanied by "Pam," a civilian cooperating with Detective Neelon in this investigation, who played the role of a prostitute working for him. Also during that first visit, Detective Neelon introduced appellant to "Gloria," an undercover policewoman.

During their meetings, Detective Neelon made numerous overtures to appellant to gain his confidence and to induce him to sell him cocaine. He offered appellant sex with "Gloria," "Pam," and other women. He offered appellant drugs.

He promised to bring appellant backstage during rock concerts. Finally he told Jon Cornell and appellant he was throwing a party at his Bratenahl mansion, that he wanted to rent five limousines for the event, and that they were both invited to the party.

Appellant displayed a familiarity with drugs before Detective Neelon offered to purchase cocaine. The evidence discloses that appellant volunteered that he liked cocaine, and that he purchased marijuana.

When Detective Neelon indicated he wished to purchase cocaine, appellant stated that he could provide it, and quoted Detective Neelon a price. Later Detective Neelon again offered to purchase cocaine from appellant, and appellant offered to sell some to him.

Three days later, on December 6, 1982, while riding in the limousine, appellant gave Detective Neelon a small bag of marijuana and loaned him a pipe to smoke it with. Later on December 6, during a telephone conversation, Cornell asked Detective Neelon his business address and the name of his company, and stated that he could not find Detective Neelon's assumed name (Goodman) in the phone book. In a subsequent conversation appellant told Detective Neelon, "I didn't get anything together on that yet." The next day, appellant told Detective Neelon that he "didn't get a chance" to "get it together," and that "this guy's kind of hard to get ahold of all the time."

During this time Cornell called a friend at the police department, Officer Joseph Kocab, to trace the license number on Detective Neelon's automobile. Patrolman Kocab testified that he was unable to acquire this information for Mr. Cornell, and that he thereafter received a telephone call from Detective Neelon.

On December 7, 1982, Detective Neelon and appellant met. Appellant offered to sell Detective Neelon a pound of cocaine for $28,800 ($1,800 per ounce).

Appellant expressed distrust of Detective Neelon, even asking to see his driver's license. The evidence shows that Detective Neelon gave appellant two opportunities to back out of the sale.

Detective Neelon also, however, promised appellant that he would protect appellant if he were arrested. Specifically, he said he would bribe a judge with $30,000, if appellant were prosecuted. Detective Neelon also promised that if appellant would sell him the cocaine, they could meet "Pam" and "party" with her.

Detective Neelon persuaded appellant to take a chance on him, and appellant relented, agreeing to procure cocaine for Detective Neelon:

"C [Carl Latina]: I have a job tonight. I'll see if I can get ahold of these persons.

"T [Thomas Neelon]: I'm in no hurry, even if you want to make it tomorrow. You know, don't go out of your way.

"C: Okay. I guess we'll see what happens. Taken a number of chances before.

"T: Well, like I say, if you don't that's okay. I don't wanna, you know, I understand, you know.

"C: (inaudible)

"T: Sure, sure.

"C: (inaudible) we're talking about $30,000. (inaudible) That might not be alot.

"T: I wouldn't want to start off with that. First of all, I just wanted to see what I'm getting into, you know.

"C: Right. That's what I want you to do. Next time I see him, I'll get it myself. That way I'll have it and that way when I hook up with you whenever, maybe I can have it."

Over the phone later the same day, appellant stated he was going home and would call Neelon back. On December 9, Detective Neelon called appellant at home and appellant told him, "I'm not gonna get it together," "It's too rich for my blood," and "I'm just not gonna get involved in it. I don't have anything to do

with that anyhow, so no use in jumpin' in it right now."

The defense called five witnesses (Robin Sacco, Richard Mills, Kathleen Zitzman, Julie Lachanski, and Janet Hutchins) to testify that they had ridden in a Rush Limousine, driven by appellant in late 1982, and that he had not offered to sell them drugs. Appellant's mother testified that her son was hospitalized in September and October 1982, and that he worked as a limousine driver only three to five times until he moved out in mid-November 1982. (This testimony was introduced to counter evidence adduced by the prosecution that appellant had offered anonymous persons drugs while driving the limousine during this period.)

A hospital record was also offered in evidence, showing appellant was hospitalized in 1982 from August 30 to September 8, and September 28 to October 16, with "disseminated herpes simplex" and "thrombocytopenic purpura." The discharge summary for the second hospitalization states, "The patient also denied history of drug abuse except for using chronically marijuana." Appellant did not testify.

The five count indictment against appellant included the following charges:

(1) That on December 3, appellant offered to sell cocaine, in an amount equal to or exceeding the bulk amount but less than three times the bulk amount (R.C. 2925.03);

(2) That on December 7, appellant offered to sell cocaine in an amount equal to or exceeding three times the bulk amount (R.C. 2925.03);

(3) That on December 6, appellant sold or offered to sell marijuana in an amount less than the bulk amount (R.C. 2925.03);

(4) & (5) That in December, appellant knowingly permitted an automobile to be used for the commission of a felony drug offense, to-wit, sale of cocaine (two counts) (R.C. 2925.13).

The relevant statutory provisions are set forth below.

R.C. 2925.03 states in relevant part:

"(A) No person shall knowingly do any of the following:

"(1) Sell or offer to sell a controlled substance in an amount less than the minimum bulk amount as defined in section 2925.01 of the Revised Code;

"* * *

"(5) Sell or offer to sell a controlled substance in an amount equal to or exceeding the bulk amount but in an amount less than three times that amount;

"* * *

"(7) Sell or offer to sell a controlled substance in an amount equal to or exceeding three times the bulk amount;

"* * *"

R.C. 2925.13(A) provides:

"No person, being the owner, operator, or person in charge of a locomotive, watercraft, aircraft, or other vehicles as defined in division (A) of section 4501.01 of the Revised Code, shall knowingly permit such vehicle to be used for commission of a felony drug abuse offense."

## I

Appellant contends in his first assignment of error that "the trial court erroneously rejected appellant's assertion, made in a pretrial motion to dismiss and in motions for judgment of acquittal, that the term 'offer to sell,' in R.C. 2925.03, was unconstitutionally vague on its face and as applied in the instant case."

Appellant contends that the term "offer to sell" contained in R.C. 2925.03 is unconstitutionally vague on its face and as applied.

The statute was held to be constitutional on its face in *State* v. *Scott* (1982), 69 Ohio St. 2d 439, 441 [23 O.O.3d 390], wherein the Ohio Supreme Court held:

"* * * appellant's argument that R.C. 2925.03(A)(1) is unconstitutionally vague fails. 'All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden.' *Rose* v. *Locke* (1975), 423 U.S. 48, 50. As dis-

cussed above, R.C. 2925.03(A)(1) is clear on its face. 'Offer' is a common word whose meaning need not be statutorily defined. Therefore, appellant received his fair warning that the Revised Code defines his offering to sell a controlled substance as the crime of aggravated trafficking."

Nor is the statute unconstitutionally vague as applied to the facts in this case. Similar to the defendant in *Scott, supra,* appellant on two occasions "offered to sell [narcotics] to the agent and serve as a link in the chain of supply." 69 Ohio St. 2d, at 441.

The first assigned error is not well-taken.

II

Appellant contends in his second assignment of error that "the trial court erroneously overruled appellant's motion to dismiss the indictment on grounds the indictment was obtained, through outrageous governmental conduct, without an evidentiary hearing, in violation of appellant's rights to due process under the Fourteenth Amendment to the United States Constitution."

Essentially, he contends that he was induced into committing this offense by Detective Neelon's promises of sex, drugs, money, and protection. This is the affirmative defense of entrapment, defined in the first paragraph of the syllabus of *State* v. *Doran* (1983), 5 Ohio St. 3d 187:

"The defense of entrapment is established where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute."

In *United States* v. *Russell* (1973), 411 U.S. 423, 431-432, the United States Supreme Court overturned a decision by the Ninth Circuit Court of Appeals, which had held, as a matter of law, that "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." 459 F. 2d 671, 673. In *Russell, supra,* at 431-432, the Supreme Court stated:

"While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, * * * the instant case is distinctly not of that breed."

The court found that the defendant was relegated to the defense of entrapment.

The *obiter dictum* in *Russell,* which left open the door to a possible due process defense in entrapment cases, was repudiated by a plurality of the court in *Hampton* v. *United States* (1976), 425 U.S. 484, wherein it was held that the remedy of a defendant for the acts of government agents lay solely in the defense of entrapment, not the Due Process Clause. A majority of the Supreme Court has yet to determine whether a general due process claim may be raised on account of outrageous government conduct, in addition to the defense of entrapment. The lower federal courts are split on the issue.

In an analogous context, the theory of a separate due process claim was rejected in *United States* v. *Payner* (1980), 447 U.S. 727. In *Payner,* the District Court for the Northern District of Ohio excluded evidence which had been stolen by federal agents from a third person. The Court of Appeals for the Sixth Circuit affirmed. The Supreme Court reversed, holding that the district court lacked authority to suppress evidence which was not seized in violation of the defendant's constitutional rights.

The Ohio courts have not recognized a due process defense of outrageous government conduct separate from the entrapment defense. This court is persuaded that it is more appropriate to characterize the defense as "entrapment

as a matter of law," *i.e.,* the indictment must be dismissed where the evidence is in such a posture that no reasonable person could find that the defendant was not entrapped. This will almost certainly involve "outrageous government conduct."

In the case at bar, Detective Neelon offered powerful inducements in establishing a relationship with appellant. But the evidence demonstrates that it was appellant who told Detective Neelon that he knew a supplier of cocaine, that appellant suggested a price, and that appellant repeated his offer to sell cocaine after Detective Neelon proposed that appellant back out of the deal. This evidence, in our opinion, constitutes sufficient demonstration of appellant's predisposition to commit the crimes of offering to sell cocaine to justify submission of the issue of entrapment to the jury.

The second assigned error is not well-taken.

### III

Appellant contends in his third assignment of error that "the trial court erroneously permitted Detective Neelon to testify, over objection, that anonymous informers had told him and other police officers by telephone on unspecified dates that appellant was involved in the sale of cocaine."

On direct examination, Detective Neelon was *not* permitted to testify concerning the substance of citizen complaints that prompted the investigation of appellant. On cross-examination, defense counsel questioned Detective Neelon concerning the fact that Detective Neelon mentioned "cocaine" to appellant in conversation, before appellant brought up the subject of drugs. On redirect, Detective Neelon was permitted to testify that the anonymous complaints had indicated that appellant was selling cocaine.

The defense, of course, was entrapment. From the opening statement of defense counsel it appears that great emphasis was placed upon the fact that it was Detective Neelon who brought up the subject of drugs.[1]

The prosecution contends that the defense opened the door to this subject by inquiring of Detective Neelon whether he was the first to mention cocaine. The state's position is that Detective Neelon's "state of mind" was thereby placed into issue, and that the citizen complaints were admitted not for their truth, but to show that Detective Neelon acted in good faith. In closing argument the prosecution referred briefly to the evidence of the prior complaints as bearing upon why the appellant was singled out for investigation.

Evidence of anonymous citizen complaints against appellant, if offered for its truth, would be inadmissible hearsay. Evid. R. 802. There was some probative value, as previously noted, in showing that the police investigation of appellant did not arise from improper motive. Though the danger of unfair prejudice from misuse of the evidence was great,

---

[1] The following are excerpts from the opening statement of defense counsel:

"The evidence will establish that the Cleveland Police Department did set up this quote, sting operation, that they centered in on Carl Latina for no good reason — perhaps of misinformation.

"\* \* \*

"The evidence will further establish, ladies and gentlemen, that the first person to ever mention anything about drugs, or specifically Cocaine, was the undercover police officer.

"\* \* \*

"That is clear. The first person to mention anything about drugs was the police officer.

"\* \* \*

"You will have the tape recordings of those phone calls, and in each one of those phone calls, the first person to raise issues to plant the idea — the seed of drugs and obtaining drugs, was the undercover police officer, and not Carl Latina. \* \* \*"

this court is not persuaded that such misuse occurred.

The third assigned error is not well-taken.

## IV

Appellant contends in his fourth assignment of error that "the trial court erroneously denied appellant's motion to sever count III, charging an unrelated misdemeanor involving marijuana, from the remaining counts of the indictment, thereby prejudicing appellant's right to a fair trial."

Ohio Crim. R. 8(A) governing joinder of offenses provides:

"Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."

Appellant's gift of marijuana occurred while appellant was purportedly arranging to provide Detective Neelon with a substantial amount of cocaine, and demonstrated to Detective Neelon his familiarity with drugs. This court has no difficulty in finding that the gift occurred in the same course of conduct as the offers to sell cocaine.

The fourth assigned error is overruled.

## V

Appellant contends in his fifth assignment of error that "the trial court erroneously refused appellant's proposed jury instruction on the 'agent of the purchaser' defense."

The "agent of the purchaser" defense is discussed, but not adopted, in footnote 2 of an unreported decision of this court, *State* v. *Campbell* (May 5, 1983), Cuyahoga App. No. 45565.[2]

Before *Campbell* was decided, the Ohio Supreme Court indicated that a defendant who offers to provide narcotics as "a link in the chain of supply" is guilty of "offering to sell." *State* v. *Scott* (1982), 69 Ohio St. 2d 439, 441. Rules of agency law are appropriately employed to determine fiduciary rights and responsibilities, and vicarious liability, in the fields of tort and contract law. These principles have no bearing in fixing criminal responsibility in the sale of narcotics, where all links in the chain of supply are equally culpable. Consequently, this court declines to recognize "agent of the purchaser" as a separate criminal defense.

This essentially means that a person who knowingly transfers or offers to transfer narcotics is guilty of selling or offering to sell narcotics within the meaning of R.C. 2925.03. The term "sale," as used in the drug law, is defined as including a "transfer," by a principal or agent, in R.C. 3719.01(EE), which provides:

" 'Sale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each such transaction made by any person, whether as principal, proprietor, agent, servant, or employee."

Furthermore, there is no evidence that appellant was "purchasing" rather than "selling" cocaine in the case at bar. The trial court correctly refused to give the instruction requested by the defense.

The fifth assigned error is overruled.

## VI

Appellant contends in his sixth assignment of error that his "conviction must be reversed, as a matter of law, where the investigating officer interjected that appellant had not taken a polygraph examination about his involvement in the alleged cocaine offenses."

Detective Neelon testified that after appellant was arrested, he admitted to

---

[2] See Appendix "A" attached.

him (Detective Neelon) that he was responsible for Mr. Cornell's attempt to check Detective Neelon's license number, and that he (appellant) thought Detective Neelon would be "a good one-time shot, a good score."

A colloquy developed on cross-examination, when defense counsel inquired of Detective Neelon why he didn't record statements by appellant.[3]

The misconduct of the witness for the prosecution is clearly demonstrated by this colloquy. However, this court is not convinced that it so prejudicially infected the trial as to deprive the appellant of due process of law. The trial court instructed the jury to disregard Detective Neelon's comment. The defense did not request the court to declare a mistrial.

Detective Neelon did not state to the jury that appellant had refused to take a polygraph examination. Moreover, in the context in which the witness' statement occurred, we do not find that the reference to a lie detector was a deliberate attempt to prejudice the jury.

The sixth assigned error is overruled.

## VII

Appellant contends in his seventh assignment of error that his "conviction must be reversed as a matter of law because it was based upon inaudible, unintelligible and untrustworthy tape-recordings of conversations involving appellant and undercover police."

Appellant contends that the tape recordings played in court were of such low quality that a conviction could not fairly be based upon them. The defense, however, stipulated to the accuracy of the typed transcripts of the recordings, which were introduced into evidence without objection.

The seventh assigned error is not well-taken.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

CORRIGAN, P.J., and PRYATEL, J., concur.

---

[3] The following colloquy occurred during cross-examination between defense counsel and Detective Neelon:

"Q. Now, the statements you claim that Carl Latina made to you at the time of his arrest, during the booking process, was there any reason why those were not recorded?

"A. Well, I believe if after I've advised him of his rights — that is my job — that's all I have to do.

"If he wants to make a statement before that or after that, that's up to him.

"If I were to bring out the tape recorder after I give him his rights, I doubt he would say anything. But he's been advised of his rights. He understands them, which he stated he did.

"Any statement he makes to me orally goes on the report, and it's written in the report, which I did.

"If I would have brought the recorder out, chances are he wouldn't have made that statement. So legally, I was in the right.

"Q. If you had brought the recorder out and recorded your conversation with him, there would be no question as to who said what, would there?

"MR. BAKEMAN [assistant prosecuting attorney]: Objection.

"THE COURT: Overruled.

"THE WITNESS: If he would have said something, you're right, there wouldn't have been any question. But if you would have brought out a tape recorder in front of me after I've been arrested, I wouldn't have said nothing.

BY MR. ROTATORI:

"Q. Then, there would be no question that he didn't say anything?

"A. Well, take a lie detector test. I'll take one, too.

"MR. ROTATORI: Your Honor, I move to strike that last comment. It's not —

"THE COURT: Comment of the witness will be stricken.

"Jury will be instructed to disregard it."

APPENDIX "A"

The footnote from *State* v. *Campbell* states at page 6:

"Defendant did not contend at trial or on appeal that he was simply a 'procuring agent' for the informant, who acted solely as the informant's agent in a purchase transaction. An agent of the seller is equally culpable for the illicit sale. See R.C. 3719.01(EE) (definition of 'sale' for controlled substances). But a purchaser or his agent may only be guilty of the lesser offense of possession. *People* v. *Feldman* (N.Y. 1980), 407 N.E. 2d 448; *People* v. *Hall* (Colo. App. 1980), 662 P. 2d 571; *State* v. *Erickson* (Haw. 1978), 586 P. 2d 1022; *Yetter* v. *State* (Okla. 1974), 528 P. 2d 345; *Commonwealth* v. *Harvard* (Mass. 1969), 253 N.E. 2d 346; *Smith* v. *State* (Tex. 1965), 396 S.W. 2d 876; *United States* v. *Barcella* (C.A. 1, 1970), 432 F. 2d 570; *United States* v. *Winfield* (C.A. 2, 1965), 341 F. 2d 70; *Myers* v. *United States* (C.A. 8, 1964), 337 F. 2d 22; *United States* v. *Sizer* (C.A. 4, 1961), 292 F. 2d 596; *Vasquez* v. *United States* (C.A. 9, 1961), 290 F. 2d 897; *Kelley* v. *United States* (C.A.D.C. 1960), 275 F. 2d 10; *Adams* v. *United States* (C.A. 5, 1955), 220 F. 2d 297; *United States* v. *Sawyer* (C.A. 3, 1954), 210 F. 2d 169. Other states have rejected the defense. See *State* v. *Matson* (Wash. 1978), 587 P. 2d 540; *State* v. *Roach* (Ariz. 1973), 506 P. 2d 1039.

"We take no position whether this defense applies to a charge under the Ohio code, and we have found no Ohio cases which discuss that issue. We do note that federal cases allowing this defense have been legislatively superseded by an amendment to the federal code which changes the offense from 'sale' to 'distribute' a controlled substance. 18 U.S.C. 1841."