[Cite as *State v. Stutler*, 2019-Ohio-2120.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2018CA00066 |
| CHARLES D. STUTLER | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:    Criminal appeal from the Stark County
Court of Common Pleas, Case No.
2017CR1253A

JUDGMENT:                          Affirmed

DATE OF JUDGMENT ENTRY:      May 28, 2019

APPEARANCES:

For Plaintiff-Appellee                     For Defendant-Appellant

JOHN D. FERRERO                       ANTHONY KOUKOUTAS
Stark County Prosecutor                116 Cleveland Avenue North, Ste. 808
BY: KATHLEEN TATARSKY             Canton, OH 44702
110 Central Plaza South
Canton, OH  44702

*Gwin, P.J.*

{¶1}   Appellant Charles D. Stutler ["Stutler"] appeals his convictions and sentence after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2}   C.C. shared a home with her mother, R.C. and her grandmother.  C.C. had fashioned a living area for herself in the basement with a bed and a table.  C.C. was a heroin user.  At first, she would snort it; later she would inject it with a syringe and needle.

{¶3}   C.C. spent the night before she died with her mother, sister and her boyfriend at a skilled games parlor.  C.C. won $70.00.  C.C. and her mother stayed out all night and got back to their residence around 7:30 the next morning.

{¶4}   At around 9:00 am, R.C., C.C.'s mother, went down the street to a neighbor's to have the struts on her car replaced.  While waiting at the neighbor's house for the car to be repaired, she looked out and kept seeing C.C. go outside of her home.  R.C. thought, "She might be untangling the dogs or something."

{¶5}   R.C. returned to the home around 1:15 that afternoon and noticed that C.C. was high.  C.C. was a known heroin user.  She had overdosed on at least two previous occasions and her mother had taken her to the hospital.  C.C. used heroin almost every day.  That morning, C.C. asked her boyfriend, M.R. for a ride to meet up with K.C. and Stutler for her "stuff."  However, her boyfriend refused to take her and left.  He last talked with C.C. around 5:00 pm that day.

{¶6}   R.C. went to take a nap and around 7:35 pm., C.C. woke her up because the basement was flooding.  After dealing with that situation, R.C. went back to bed.  C.C. was logged into Facebook around 8:09 pm and liked one of her mother's posts.

{¶7} On March 31, 2017 about 8:26 pm, R.C. woke up from a nap and went down to the basement to check on her daughter. R.C. opened the door to C.C.'s living area and found her daughter laying on the floor next to a chair. She rolled her daughter over and a needle fell out of her arm. C.C. vomited. R.C. felt her daughter's face and it was just slightly warm; her arms, belly and legs were really warm. She felt a real light pulse. She rubbed C.C.'s chest as she had done in the past, but got no response. She called 9-1-1.

{¶8} Deputy Jeffrey Leggett of the Stark County Sheriff's Department testified that he responded to the 9-1-1 call for service at the home. Deputy Leggett testified that upon his arrival, paramedics were already on the scene performing CPR and administering Narcan to C.C.

{¶9} C.C. was eventually transported by ambulance to Mercy Medical Hospital. The paramedics continued to work on her and kept up the CPR. They even tried an intraosseous access, specifically an IV inserted into bone marrow, in order to administer drugs to her in attempt to get her heart beating. Further attempts were made to revive C.C. at the hospital; however, C.C. passed away. It was later determined that the cause of death was the use of carfentanil.

{¶10} After C.C.'s body was transported to the hospital, the responding Deputy Sheriffs took photographs of the room and collected evidence. They found several syringes including one on a table. A spoon with white residue was found on a wooden cabinet.

{¶11} Deputy Jarrod Blanc testified that the other deputies gave him some of the evidence that they had collected and that he went to the hospital to speak with R.C.

Deputy Blanc learned that C.C. had been using her grandmother's cell phone. The phone was taken into evidence and Deputy Blanc started looking through the text messages that it contained in order to find any referencing or talking about narcotics trafficking. He found a number of text messages from one specific cell phone that were indicative of narcotics trafficking. Using social media, Deputy Blanc was able to link the phone number to a cell phone that was registered to Stutler's mother, but that Stutler had listed as his number on his Facebook profile page.

{¶12} Deputy Blanc obtained a search warrant to search the telephone number used by Stutler and found other text messages between C.C. and Stutler, and between Stutler and K.C. Shortly after C.C. death, Stutler changed the cell phone number. However, before he shut off his cell phone number, Blanc retrieved a text message on April 2, 2017 from Stutler to an unidentified number that read, "I'm just done with this dope game."

{¶13} On April 4, 2017, Deputy Blanc returned to the home. R.C. found a blue powdery substance that had been hidden in C.C. basement room. The substance was later identified as carfentanil.

{¶14} K. C. and C.C. were friends for about five years. K.C. used heroin with C.C. all the time. On March 31, 2017, K.C. lived with Stutler. K.C., C.C. and Stutler used drugs together frequently. They would obtain money for the drugs by lying to relatives, from work or in any way possible. They would pool their resources to purchase the drugs. 2T. at 411-412. K.C. testified that Stutler went to purchase drugs for her before her shift on March 30, 2017. 2T. at 415. After hearing that C.C. had died, Stutler told K.C. that he and C.C. had put their money together to buy drugs and he took the drugs to her that day. 2T. at 418 - 419.

{¶15} C.C.'s body was transferred to the Stark County Coroner's Office where Frank P. Miller, Stark County Deputy Coroner, performed an examination. He took photographs, did preliminary urine testing, and took toxicology samples, fluid from the eyes and blood from the femoral area. Dr. Miller sent the blood, urine and vitreous samples to Axis Forensics Toxicology Laboratory for testing.

{¶16} Kevin Shanks, a senior forensic toxicologist and other toxicologists in the laboratory did testing of the samples sent by Dr. Miller. First, they did an initial screening for cannabinoids, like THC, marijuana and opiates like morphine, codeine and hydrocodone. Then, they did a second screening - a drugs of abuse panel - by mass spectrometry for 300 different substances including heroin, fentanyl, barbiturates, benzodiazepines, antidepressants and antipsychotic drugs. Heroin metabolites and fentanyl are included in the drugs of abuse panel; carfentanil is not. Then, they did a blood screening for alcohol.

{¶17} THC and THC metabolites from marijuana use were found in C.C.'s blood samples; fentanyl was not found in her blood stream. Morphine and norfentanyl were found in C.C.'s urine samples. Heroin metabolizes to morphine. Fentanyl metabolizes to norfentanyl. For urine testing, the results are reported as positive or negative and a specific amount is not reported for the reason that urine is a waste product - any drug or metabolite that is in the urine is no longer affecting the body. Because blood is actively circulating through the body, blood testing can tell you what the body consumed within several hours to a day. Shanks opined that because heroin and fentanyl were found in C.C.'s urine and not her blood, she would have ingested the substance within one to four days, but not within 24 hours.

{¶18} Axis was then asked to do additional testing for "designer opioids and fentanyl analogues," including carfentanil.  Carfentanil is a commercial veterinary medicine used to sedate and immobilize large exotic animals such as rhinos or elephants.  It is 10,000 times more potent than morphine.  It is not meant to be used in humans because of its potency.  Further tests performed at Axis found carfentanil in C.C.'s blood.

{¶19} The jury found Stutler guilty of Involuntary Manslaughter and one count of Aggravated Trafficking in Drugs.  The underlying felony for the involuntary manslaughter charge was the aggravated trafficking in drugs charge; the drug carfentanil.

{¶20} Stutler was sentenced to ten years in prison on the involuntary manslaughter conviction and eighteen months on the aggravated trafficking in drugs conviction.  The sentences were imposed concurrently for a total prison term of ten years.

*Assignments of Error*

{¶21} Stutler raises three assignments of error,

{¶22} "I. THE APPELLANT WAS PREJUDICED BY PROSECUTORIAL MISCONDUCT DURING VOIR DIRE.

{¶23} "II. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE APPELLANT'S MOTION FOR A MISTRIAL.

{¶24} "III. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

I.

**{¶25}** Stutler claims that prosecutorial misconduct occurred during the voir dire that denied him his right to a fair trial. Specifically, Stutler argues that the prosecutor during voir dire made a statement that did not accurately reflect the law,

So when the Judge tells you at the end of this trial, when she says, "If you believe that the State has proved that the Defendant supplied the drugs to the victim, the victim used those drugs voluntarily, the supply of those drugs caused her death, you must find the Defendant guilty," can everybody do that?

1T. at 96[1]. The prosecutor was told by the trial court that she did not use the element of "proximate cause." 1T. at 96-97. Furthermore, during a break outside the hearing of the jurors the following exchange took place,

"THE COURT:            Here's the thing, Toni: This is what you did not say. The way the jury instructions read: "The Defendant caused the death of [C.C.] as a proximate result of committing or attempting to commit aggravated trafficking."

"As a proximate result." That proximate result is the jury question. It is not sufficient that you say he committed aggravated trafficking and she died.

MS. SCHNELLINGER:      No.

THE COURT:            There has to be - -

MS. SCHNELLINGER:      Right, but the trafficking has to cause the involuntary mans - - I'm sorry, Your Honor,

---

[1] For clarity sake, the transcript of the jury trial will be referred to by volume and page number as "T."

THE COURT:                    Yeah.  I get it.  But you were taking it to a level of you were getting a commitment from them that if you prove the aggravated trafficking and she died, that there's nothing in between that has to be proven, and it has to be a proximate result.  And 'proximate' is huge.  You are. - -

MS. SCHNELLINGER:        I'm sorry.  I - -

THE COURT:                    - - making a leap that - -

MS. SCHNELLINGER:        I thought what I was saying it made - - I will - - I can fix that.  I thought what I was saying is that the aggravated trafficking, if that's proven that he did that and he caused the death, that caused the death.  That's, that's it.  And that is it.

1T. at 102-103.  Defense counsel objected and moved for a mistrial.

**STANDARD OF APPELLATE REVIEW – PROSECUTORIAL MISCONDUCT.**

{¶26}  Allegations of prosecutorial misconduct implicate due process concerns, and the touchstone of the analysis is the "'fairness of the trial, not the culpability of the prosecutor.'"  *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 92, *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial."  *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).  With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant."  *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).  "[A] defendant's substantial rights

cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30 (8th Dist.2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

*State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 109.

**{¶27}** Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review de novo. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009 (*citing United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999) (*citing United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993)).

**ISSUE FOR APPEAL.**

*A. Whether the state committed misconduct and if so did the misconduct prejudicially affect Stutler's substantial due process rights.*

**{¶28}** In *State v. Shine-Johnson,* the Court observed,

"The prosecuting attorney does not instruct the jury on the law, the trial judge does." *State v. Palmer*, 7th Dist. No. 89-B-28, 1996 WL 495576 (Aug. 29, 1996). However, a prosecuting attorney should not mislead the jury by either misstating the law or the facts. *State v. Crossty*, 12th Dist. No. CA2008-03-070, 2009-Ohio-2800, 2009 WL 1655495, ¶ 45, *citing State v. DePew,* 38 Ohio St.3d 275, 288, 528 N.E.2d 542 (1988).

10th Dist. Franklin No. 17AP-194, 2018-Ohio-3347, ¶74. In the case at bar, the prosecutor's questioning as previously noted was a misstatement of the law,

> "The term 'proximate result' in the involuntary manslaughter statute involves two concepts: causation and foreseeability." *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, 2017 WL 957747, ¶ 71. In regards to causation, we have held that "[g]enerally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *State v. Feltner,* 12th Dist. Butler No. CA2008-01-009, 2008-Ohio-5212, 2008 WL 4456973, ¶ 13. With respect to foreseeability, this court has held "when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable." *Hall* at ¶ 78. Furthermore, a defendant will be held responsible for foreseeable consequences "which are known to be, or should be known to be, within the scope of the risk created by his conduct." Id. at ¶ 79.

*State v. Potee,* 12th Dist. Clermont No. CA2016-06-045, 2017-Ohio-2926, ¶ 33. *See also, State v. Carpenter,* 3rd Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶51-53(discussing "cause" and "proximate cause"); *State v. Luce,* 5th Dist. Ashland No. 17 COA 040, 2018-Ohio-3865, ¶29 ("we first note that "[i]t is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be

foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Wells,* 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 35, *citing State v. Losey*, 23 Ohio App.3d 93, 96 (10th Dist.1985).").

**{¶29}** Our review of the record in Stutler's case establishes that the prosecutor's questioning was accidental and mistaken. We find no evidence that the prosecutor intentionally misstated the law.

**{¶30}** We further find that the trial judge issued thorough curative instructions that included informing the jury that the court instructs on the law, not the attorneys. 1T. at 126-127. Further, the trial court instructed the jury on the elements of involuntary manslaughter including "proximate result" and "cause." 1T. at 128.

**{¶31}** Looking at the prosecutor's statement in the larger context of the trial, we find the prosecutor's statement did not prejudicially affect Stutler's substantial due process rights.

**{¶32}** Stutler was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶33}** Stutler's First Assignment of Error is overruled.

II.

**{¶34}** In his Second Assignment of Error, Stutler argues that the trial court abused its discretion in failing to grant a mistrial based upon the inaccurate statement of law made by the Prosecutor during voir dire as set forth in his First Assignment of Error.

**STANDARD OF APPELLATE REVIEW – MISTRIAL.**

**{¶35}** "Mistrials need to be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The standard of review for evaluating a trial court's decision to grant or deny a mistrial is abuse of discretion. *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). In reviewing a claim that a mistrial should have been granted, the Ohio Supreme Court has noted "[t]his court has instead adopted an approach which grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *State v. Shaffer*, 5th Dist. Richland No. 2003-CA-0108, 2004-Ohio-3717, ¶18 *quoting [State v.] Widner* [68 Ohio St.2d 188, 429 N.E.2d 1065(1981)]. *See, also, Wade v. Hunter*, 336 U.S. 684, 687, 69 S.Ct. 834, 836, 93 L.Ed. 974(1949).

**{¶36}** An abuse of discretion can be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *Tennant v. Gallick,* 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; *In re Guardianship of S .H.*, 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi,* 5th Dist. Licking No.2006–CA–41, 2006–Ohio–5823, ¶54.

ISSUE FOR APPEAL.

*A.  Whether the trial court abused its discretion by denying Stutler's motion for a mistrial.*

**{¶37}** The trial court quickly corrected the alleged error in the prosecutor's voir dire by not only giving a curative instruction telling the jury that the trial court is the sole instructor on the law, but in reading the jury instruction regarding causation.  The trial court read the jury instruction again at the close of trial.  The jury also had the jury instructions in writing during deliberations.

**{¶38}** "Juries are presumed to follow their instructions."  *Zafiro v. United States* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317(1993).  "A presumption always exists that the jury has followed the instructions given to it by the trial court," *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313(1990), at paragraph four of the syllabus*, rehearing denied*, 54 Ohio St.3d 716, 562 N.E.2d 163.

**{¶39}** As discussed in our disposition of Stutler's First Assignment of Error, the comments of the prosecutor did not prejudicially affect Stutler's substantial due process rights.  Stutler was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**{¶40}** The trial court did not abuse its discretion in denying Stutler's motion for a mistrial.

**{¶41}** Stutler's Second Assignment of Error is overruled.

III.

{¶42} In his Third Assignment of Error, Stutler claims that his convictions for involuntary manslaughter and aggravated trafficking in drugs were against the manifest weight and sufficiency of the evidence. Specifically, Stutler argues, "There were no witnesses who testified that they saw the Appellant engage in a drug transaction with [C.C.]. In addition, there were no statements by the Appellant wherein he admitted to giving drugs to [C.C.] except from [K.C.], an admitted liar." *Brief of Defendant-Appellant,* filed Dec. 10, 2018 at 10.

**STANDARD OF APPELLATE REVIEW.**

*Sufficiency of the Evidence.*

{¶43} The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. __, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson,* 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶44} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus: *Walker,* at ¶30. "The relevant inquiry

is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney,* 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus (emphasis added); *Walker* at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

### ISSUE FOR APPEAL

*A. Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, "if believed, would convince the average mind of Stutler's guilt on each element of the crimes beyond a reasonable doubt."*

**{¶45}** Stutler was convicted of involuntary manslaughter, R.C. 2903.04(A), "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." The culpable mental state of involuntary manslaughter is supplied by the underlying offense. *State v. Johnson*, 8th Dist., Cuyahoga App. No. 94813, 2011-Ohio-1919, 1154.

**{¶46}** The predicate offense in this case was aggravated trafficking in drugs, in violation of R.C. 2925.03(A)(1). This statute states that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance or a controlled substance analog."

**{¶47}** R.C. 2901.22(B) states as follows, "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

**{¶48}** As we noted in our disposition of Stutler's First Assignment of Error,

"The term 'proximate result' in the involuntary manslaughter statute involves two concepts: causation and foreseeability." *State v. Hall*, 12th Dist. Preble No. CA2015-11-022, 2017-Ohio-879, 2017 WL 957747, ¶ 71. In regards to causation, we have held that "[g]enerally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred 'but for' the conduct." *State v. Feltner,* 12th Dist. Butler No. CA2008-01-009, 2008-Ohio-5212, 2008 WL 4456973, ¶ 13. With respect to foreseeability, this court has held "when the result varied from the harm intended or hazarded, it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something

so unforeseeable." *Hall* at ¶ 78. Furthermore, a defendant will be held responsible for foreseeable consequences "which are known to be, or should be known to be, within the scope of the risk created by his conduct." Id. at ¶ 79.

*State v. Potee,* 12th Dist. Clermont No. CA2016-06-045, 2017-Ohio-2926, ¶ 33. *See also, State v. Carpenter,* 3rd Dist. Seneca No. 13-18-16, 2019-Ohio-58, ¶51-53(discussing "cause" and "proximate cause"); *State v. Luce,* 5th Dist. Ashland No. 17 COA 040, 2018-Ohio-3865, ¶29 ("we first note that "[i]t is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Wells,* 12th Dist. Warren No. CA2016-02-009, 2017-Ohio-420, ¶ 35, *citing State v. Losey*, 23 Ohio App.3d 93, 96 (10th Dist.1985).").

### 1. "Sell" or "offer to sell."

**{¶49}** For purposes of R.C. Chapter 2925, a sale is defined as follows: "'Sale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee." R.C. 2925.01(A) (incorporating definition found in R.C. 3719.01(AA)).

**{¶50}** In the case at bar, C.C.'s boyfriend, M. R. testified that C.C. asked him to give her a ride to meet up with K.C. and Stutler to get drugs. The state further presented text messages indicating that C.C. asked Stutler to bring her drugs.

**{¶51}** At 6:38 am, C.C. sent a text to Stutler, "You gotta call me ASAP...It's [C.C.]

**{¶52}** At 9:46 am, C.C. sent a test to Stutler, "Grandma just woke me. I didn't miss you, did I?"

**{¶53}** At 9:47 am, Stutler sent a text to C.C., "I'm getting ready 2 leave. What do you got?"

**{¶54}** At 9:47am, C.C. sent a text to Stutler, "70."

**{¶55}** At 10:46 am Stutler sent a text to C.C., "I'm meeting him now 2 get it, then I'll be out."

**{¶56}** At 11:29 am, C.C. sent a text to Stutler, "Hello, were u — Hello, were u at? U gonna text me or what?"

**{¶57}** At 12:36, there was an eleven-second telephone call between Stutler and C.C.

**{¶58}** At 12:36 pm, Stutler sent a text to C.C., "On ur road."

State's Exhibit 11A-I; 3T. at 587-591. Stutler claims that the state did not prove that the cell phone number in question was used by him to set up the drug transaction with C.C. However, the state demonstrated from the testimony of Deputy Blanc and K.C. that the cell phone number was registered to Stutler's mother but used by Stutler.

**{¶59}** After hearing that C.C. had died, Stutler told K.C. that he and C.C. had put their money together to buy drugs and he took the drugs to her that day. 2T. at 418 - 419.

**{¶60}** In *State v. Mitchell*, 5th Dist. No.2001CA00382, 2002–Ohio–6264, this court noted:

> "... the Ohio Supreme Court has held that 'R.C. 2925.03 demonstrates a clear legislative intent to define commerce in controlled substances as criminal ... Consistent with this purpose, the General

Assembly defined each of [the] stages of commerce in controlled substances as aggravated trafficking....'  *State v. Scott* (1982), 69 Ohio St.2d 439, 440–441, 432 N.E.2d 798.  In *State v. Scott*, the Court held that by marketing a drug, an offender served as a link in the chain of supply.  Id.  Serving as a link in the chain of supply constituted an offer to sell.  Id.  From *Scott*, the Ohio Court of Appeals for the Eighth District noted that all links in the chain of supply are equally culpable.  *State v. Latina* (1984), 13 Ohio App.3d 182, 187, 468 N.E.2d 1139.  Subsequently, the Ohio Court of Appeals for the Fourth District specifically held that a person who acts as a broker in a drug sale, acts as a link in the chain of supply and is guilty of 'offering to sell' drugs within the meaning of R.C. 2925.01.  *State v. McDaniel* (Nov. 9, 1993), Vinton App. No. CA487 (citing *State v. Latina, supra,* which relied upon *State v. Scott, supra)*".  Id. at ¶ 12, 432 N.E.2d 798.

**{¶61}**  In the case at bar, there was evidence that Stutler acted, at the very least, as a link in the chain of supply by offering to deliver a quantity of drugs to C.C.

**{¶62}**  Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Stutler had committed the crime of Aggravated Trafficking.

**{¶63}**  We hold, therefore, that the state met its burden of production regarding each element of the crime of Aggravated Trafficking and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Stutler's conviction.

**2. "Causation" and "foreseeability."**

{¶64} In *State v. Luce,* this Court found,

Furthermore, "* * * the word 'knowingly' is an adverb which modifies the verb 'sell' or 'offer.'" *State v. Ward*, 3rd Dist. Crawford No. 3-17-02, 2017-Ohio-8518, ¶ 15, *citing State v. Patterson*, 69 Ohio St.2d 445, 447, 432 N.E.2d 802 (1982), *overruled in part on other grounds.* Ohio courts are thus not required to read into R.C. 2925.03(A) an additional element of knowledge of the nature of the substance. Id. In other words, the State is only required to prove beyond a reasonable doubt that the accused knowingly sold or offered to sell a controlled substance. *Ward* at ¶ 15, *citing State v. Stover*, 11th Dist. Lake No. 2015–L–041, 2016–Ohio–1361, ¶ 14 (emphasis added).

Thus, even if appellant "only" sought to sell heroin on this occasion and had no interest in supplying anyone with Carfentanil, she was still choosing to engage in the dangerous and illegal business of street-level trafficking in controlled substances. Before this Court takes the step of overturning a jury verdict on the basis of insufficient evidence, we must remind ourselves that our standard is based on the "rational trier of fact" standard set forth in *Jenks, supra*. Perhaps the General Assembly will further consider whether updates are needed in the Revised Code to more specifically address these types of tragic "drug within a drug" fatalities. However, as summarized above, upon review of the present record and transcript in a light most favorable to the prosecution, we find that

reasonable jurors could have found appellant guilty beyond a reasonable

doubt of the offense of involuntary manslaughter as charged.

5th Dist. Ashland No. 17 COA 040, 2018-Ohio-3865, ¶ 29-30.

**{¶65}** Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Stutler had committed the crime of Involuntary Manslaughter.

**{¶66}** We hold, therefore, that the state met its burden of production regarding each element of the crime of Involuntary Manslaughter and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Stutler's conviction.

*Manifest weight of the evidence.*

**{¶67}** As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

"[I]n determining whether the judgment below is manifestly against

the weight of the evidence, every reasonable intendment and every

reasonable presumption must be made in favor of the judgment and the

finding of facts.

\* \* \*

"If the evidence is susceptible of more than one construction, the

reviewing court is bound to give it that interpretation which is consistent with

the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶68}** The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

**{¶69}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist.

1983).  Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."  Id.

**ISSUE FOR APPEAL.**

*B.    Whether the jury court clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.*

**{¶70}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility.  "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence."  *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996).  Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true.  *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).  Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence.  *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶71}** In the case at bar, the jury heard the witnesses, viewed the evidence and heard Stutler's arguments and explanations about his actions.  The jury observed K.C.

subject to cross-examination. Thus, a rational basis exists in the record for the jury's decision.

{¶72} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Stutler's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Stutler's guilt.

{¶73} The jury neither lost their way nor created a miscarriage of justice in convicting Stutler of Aggravated Trafficking and Involuntary Manslaughter.

{¶74} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Stutler was convicted.

{¶75} Stutler's Third Assignment of Error is overruled.

{¶76} The judgment of the Stark County Court of Common Pleas is affirmed.